

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

NO. WR-82,265-01 & WR-82,265-02

**IN RE TYRONE ALLEN, Applicant**

**ON APPLICATION FOR A WRIT OF MANDAMUS
TO THE FIFTH COURT OF APPEALS
IN CAUSE NOS. 05-14-01167-CV & 05-14-01168-CV
FROM DALLAS COUNTY**

**Yeary, J., filed a concurring opinion.**

## CONCURRING OPINION

Applicant, Tyrone Allen, is charged in two indictments with capital murder. Applicant requested a pre-trial hearing on the issue of whether he is intellectually disabled and thus immune from the death penalty. The trial court granted that motion, but the State sought a writ of mandamus from the court of appeals to compel the trial court to vacate its order permitting the pre-trial hearing. Now Applicant seeks a writ of mandamus from this Court to compel the court of appeals to withdraw its order disallowing the pre-trial hearing, and this Court conditionally grants the writ, finding that "uncertainty surrounding intellectual-disability determinations prevents labeling the judge's actions a violation of a ministerial duty." Majority opinion at 1. I join this Court's opinion. I also write separately to provide

a little more context to the complex problem created by the United States Supreme Court's declaration that mentally retarded offenders are immune from the death penalty and to urge the Legislature to address this still relatively new development in capital jurisprudence to provide both a workable definition of mental retardation in the context of the death penalty and an appropriate procedure for the litigation of that issue.

In *Atkins v. Virginia*, decided in 2002, the United States Supreme Court discerned a national consensus against the execution of "mentally retarded" offenders and declared that such offenders are categorically immune from the death penalty. 536 U.S. 304 (2002). The Court observed, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id*. at 317. The Court noted, "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id*. But the Court refused to provide a clear framework for separating "the sheep from the goats."[1] Instead, it expressly left to the states "the task of developing appropriate ways to enforce the constitutional restriction" it had declared. *Atkins*, 536 U.S. at 317. In so doing, it forced upon the states the burden to address the challenges posed by the inevitable onslaught of claimants seeking to establish their categorical immunity from capital punishment.

In 2004, in response to *Atkins*, and in the absence of legislation in Texas carrying out the mandate of *Atkins*, but with an eye toward providing "the bench and bar with temporary judicial guidelines in addressing *Atkins* claims," this Court acted to create "judicial standards for courts considering [*Atkins*] [post-conviction habeas corpus] claims under [Texas Code of Criminal Procedure] article 11.071." *Ex parte Briseno*, 135 S.W.3d 1, 5 (Tex. Crim. App. 2004). The Court concluded it needed to act because of the "significant number of pending

---

[1] Matthew 25:32, The New American Bible, Catholic Publishers, Inc. (1971).

habeas corpus applications" it faced that argued exemption from execution based on mental retardation. *Id*.

This Court used *Briseno* to "define [from its own perspective] that level and degree of mental retardation at which a consensus of Texas citizens[2] would agree that a person should be exempted from the death penalty." *Id*. at 6. The Court recognized that, the term "mental retardation" as defined in the DSM-IV included those categorized as mildly, moderately, severely, and profoundly mentally retarded, and that "some 85% of those officially categorized as mentally retarded fall into" the mildly mentally retarded range. *Id*. at 5. The Court observed that "mental retardation is not necessarily a lifelong disorder." *Id*. at 6. And it noted that "those in the mental health profession" might understandably "define mental retardation broadly to provide an adequate safety net for those who are at the margin" and who "might well become mentally-unimpaired citizens if given additional social services support." *Id*. The Court questioned whether "a consensus of Texas citizens" would agree "that all persons who might legitimately qualify for assistance under the social services definition of mental retardation" should be "exempt from an otherwise constitutional penalty." *Id*. But in the absence of legislative guidance, it adopted the definitions of "mental retardation" then promulgated by the American Association on Mental Retardation (AAMR)[3]

---

[2]Although this Court did not explain why it felt compelled to define the level according to what it perceived to be a consensus of *Texas citizens* as opposed to *American citizens*, I presume it had in mind the Supreme Court's delegation of the duty to the States to develop "appropriate ways" to "enforce the constitutional restriction" it had spoken into existence in *Atkins*. *Atkins*, 536 U.S. at 317.

[3] The Supreme Court referred to the AAMR definition of mental retardation in *Atkins*. 536 U.S. at 308 n.3 & 317 n.22. That organization has now changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD). The Supreme Court also referred to the American Psychiatric Association (APA) definition of mental retardation as it was then described in the Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM IV-TR): "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive

and section 591.003(13) of the Texas Health and Safety Code. *Id*. Those definitions were very similar.

The AAMR definition provided that mental retardation is a disability characterized by (1) "significantly subaverage" general intellectual functioning, (2) accompanied by "related" limitations in adaptive functioning, and (3) onset prior to the age of 18. *See Ex parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004). The most recent amendment to the Texas Health and Safety Code definition of "mental retardation" defines it as "intellectual disability," and it defines "intellectual disability" as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE § 591.003(13) & (7-a).

Recently, in *Hall v. Florida*, 134 S.Ct. 1986 (2014), an opinion overturning Florida's rule, which barred persons presenting only IQ test scores over 70 "from presenting other evidence" that would show intellectual disability, the Supreme Court followed the mental health community's modification of the name "mental retardation" to "intellectual disability." The Court explained, "[p]revious opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe *the identical phenomenon*. [citations omitted]." 134 S.Ct. at 1990 (emphasis added). Clearly the Supreme Court was referring to the *identical phenomenon* in *Hall* as was referred to in *Atkins*.

In *Hall*, the Court also made the observation that, in its opinion "the medical community [still] defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during

---

functioning in at least two of the following skill areas: communication, self care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders p. 41 (4th ed. 2000).

the developmental period." *Id*. at 1994. But the changes happening in the mental health community's leading reference materials on intellectual disability deserve closer scrutiny, as they appear to indicate that the community may be moving toward a completely new understanding of the disorder described in *Atkins*—an evolution to an understanding of the disorder which may or may not be consistent with the Supreme Court's Eighth Amendment jurisprudence and which may or may not be consistent with what that Court proclaimed in *Atkins* to be the current "national consensus" concerning execution of the mentally retarded.

Justice Alito pointed out in his dissenting opinion in *Hall* that, "the views of professional associations often change." 134 S.Ct. at 2006 (Alito, J., dissenting). Indeed, the most recent revision of the APA's Diagnostic and Statistical Manual of Mental Disorders, the DSM-V, contains notable and consequential changes with respect to not only the name, but also the definition of the disorder. The most obvious change, of course, is the name of the disorder. It was previously known as "mental retardation." It is now described as "intellectual disability." But more important for purposes of considering the APA's understanding of the disorder and its relationship to Eighth Amendment jurisprudence, and particularly the death penalty, is the fact that the essential criteria for inclusion appears also to have been modified significantly.

The DSM-IV-TR previously explained that "[t]he essential feature of Mental Retardation is ***significantly*** subaverage general intellectual functioning (Criterion A) that is accompanied by ***significant*** limitations in adaptive functioning in at least two of the following areas . . . (Criterion B)."[4] The DSM-V now explains that "[t]he essential features of intellectual disability . . . are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-,

---

[4] APA, Diagnostic and Statistical Manual of Mental Disorders 41 (rev. 4th ed. 2000).

and socioculturally matched peers . . . (Criterion B) ."[5] Where the former essential features of "mental retardation" described Criterion A as "***significantly*** subaverage general intellectual functioning," the new essential features of "intellectual disability" describe Criterion A as merely "deficits in general mental abilities." Similarly, where the former essential features of "mental retardation" described Criterion B as "***significant*** limitations in adaptive functioning" the new essential features of "intellectual disability" describe Criterion B as merely "impairment in everyday adaptive functioning." These changes, and particularly the dropping of any notion of "significance" with regard to the essential features, seem to me to indicate that an expansion may be at hand—at least from the perspective of the mental health community—of the numbers of persons that might be potentially subject to a diagnosis for the disorder. In addition, the former essential features relating to Criterion B seemed to require comparison of the individual to society at large, whereas the new essential features relating to that same criterion seem to require specific comparison "to an individual's age-, gender-, and socioculturally matched peers."

The Supreme Court assures us that its determination is "informed by the views of medical experts" but that those views "do not dictate the Court's decision." *Hall*, 134 U.S. at 2000. That Court counsels that "[t]he legal determination of intellectual disability is distinct from a medical diagnosis," but the Court is also clear that the legal framework should be "informed by the medical community's diagnostic framework." *Id*. Hence, the medical community's diagnostic framework cannot be ignored in fashioning an appropriate response to the Supreme Court's mandate in *Atkins*. But, it seems to me that the medical community's diagnostic framework in place *when Atkins was decided* might be the most appropriate guidepost, not necessarily some potential variant that might be arrived at by associations of mental health professionals as they seek to further refine their professional diagnostic

---

[5] APA, Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed. 2013).

criteria. That diagnostic framework—the one in place at the time that *Atkins* was decided—is the one about which the Supreme Court claimed to discern a national consensus. While the medical community may refine its framework at any time, refinements by that community alone and in isolation give no concrete assurance that such refinements are consistent with any national consensus about death penalty immunity. To hold otherwise would seem nothing less than a complete delegation of the responsibility to identify who is categorically immune from the death penalty away from the courts and the legislatures and the people of this country, and instead to shift that responsibility to the elite leaders in the mental health community.

While I agree that it is important to remain informed by the mental health community concerning current professional thought and diagnostic criteria, the courts and the legislatures of the various states are the true laboratories for the ascertainment of national consensus, if any actually exists, concerning constitutional death penalty immunity. *See, e.g., Ex parte Cathey*, 451 S.W.3d 1, 9-10 (Tex. Crim. App. 2014) (explaining, "Although psychology and psychologists inform the factual decision, they do not determine whether an inmate is exempt from execution under *Atkins*. We must apply our own judgment. . . ."). The goals and objectives of the mental health community may not always necessarily align neatly with those of the criminal justice system. Indeed, care should be taken to guard against improper motives of some who might claim the right to define mental retardation so broadly as to cover any person who might seek a diagnosis in order to avoid the requirements of justice under the law.[6] The death penalty is a punishment, not a disease.

This case presents a perfect illustration of the inefficiencies that can, and likely will, continue to arise because of the failure of our State to legislatively define mental retardation

---

[6] *See, e.g., Cathey*, 451 S.W.3d at 15 n.42 (observing that Professor Flynn "advocates adjusting IQ scores when the death penalty is at stake because then an IQ score may be a matter of 'life or death'").

and establish procedures to give effect to the Supreme Court's mandate in *Atkins*.[7] In the event the trial court in this case conducts a pre-trial hearing to determine whether the defendant is mentally retarded, the proof at that hearing will likely include, in addition to any other evidence reflecting directly upon the criteria for establishing mental retardation, a trial of the very facts of the capital murder offense itself—separately and before the actual guilt or innocence phase of the trial.[8] Then, during the defendant's trial, the same evidence will likely be presented again. In effect, therefore, the whole case might need to be tried twice. The State will be required to marshal its evidence twice, and the witnesses will be forced to face the court and examination by counsel twice. This, it seems to me, is an unnecessary hardship for everyone involved.

The majority has already explained that "[l]egislation is required"[9] with regard to a statutory scheme for the administration of mental retardation claims. I too urge the Legislature to tackle this hard issue with all deliberate speed and to provide the guidance that is uniquely the province of that body. This Court and the other courts of our State and the people of our State need and deserve a unified procedure for the determination of these questions. We also need the Legislature to provide a clear definition of mental retardation

---

[7] On at least one prior occasion, our Legislature has passed such a bill. According to the Supreme Court's opinion in *Atkins*, the bill passed through the House on April 24, 2001, and through the Senate on May 16, 2001, but then-sitting Governor Perry vetoed the legislation on June 17, 2001. *Atkins*, 536 U.S. at 315 n.16.

[8] *See Ex parte Briseno*, 135 S.W.3d 1, 8-9 (Tex. Crim. App. 2004) (identifying "other evidentiary factors which factfinders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder," including "[p]utting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?").

[9] Majority opinion at 12.

that ought to be applied in carrying out the mandate of *Atkins* that mentally retarded persons are constitutionally protected from the death penalty.

With these additional comments, I join the opinion of the Court.


FILED:      May 13, 2015
PUBLISH